IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DOUGLAS FREULER, derivatively on §
behalf of Parker Drilling          §
Company,                           §
                                   §
            Plaintiff,             §
                                   §
VS.                                §   CIVIL ACTION H-10-3148
                                   §
ROBERT L. PARKER, JR., ROBERT      §
L. PARKER, JOHN W. GIBSON, ROGER   §
B. PLANK, R. RUDOLPH REINFRANK,    §
ROBERT E. MCKEE, III, GEORGE J.    §
DONNELLY, ROBERT W. GOLDMAN,       §
GARY R. KING, DAVID C. MANNON,     §
JAMES W. WHALEN, W. KIRK           §
BRASSFIELD, LYNN G. CULLOM, and    §
DIES 1 through 20, inclusive,      §
                                   §
            Defendants,            §
                                   §
       -and-                       §
                                   §
PARKER DRILLING COMPANY,           §
a Delaware corporation,            §
                                   §
            Defendants.            §


**OPINION AND ORDER**

Plaintiff Douglas Freuler, derivatively on behalf of Parker

Drilling Company ("Parker Drilling" or the "Company"), alleges that

Individual Defendants, all of whom are officers and Directors of

Parker Drilling, failed to adequately oversee corporate compliance

activities that were (1) in violation of the Foreign Corrupt

Practices Act of 1977 ("FCPA"), 15 U.S.C. Sec. 78dd-1 *et seq.*,[1] and, indeed, even authorized improper payments to the Company's employees, representatives, agents and/or contractors to allow them to participate in such illegal activities; and (2) in violation of the reporting requirements of the Securities Exchange of 1934, 15 U.S.C. § 78m(b)(2)(A-B),[2] by causing or allowing the Company to file false and misleading statements with the U.S. Securities and

---

[1] Under the FCPA, it is unlawful for United States issuers of United States-registered securities, or anyone acting on their behalf to bribe any foreign official in order to obtain or retain business. 15 U.S.C. Sec. 78 dd-1. Shareholder Plaintiff Douglas Freuler, derivatively on behalf of Parker Drilling, states in his complaint that Parker Drilling stock is traded on the New York Stock Exchange under the symbol "PKD" and that as an issuer of United States-registered securities; thus it is subject to the FCPA.

[2] Section 78m(b)(2)(A-B) requires every issuer that has a class of securities registered pursuant to section 78/ of this title and every issuer which is required to file reports pursuant to 78*o*(d) of this title to

> (A) make and keep books, records, and accounts, which, in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that--
>
> (i) transactions are executed in accordance with management's general or specific authorization;
>
> (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets . . . .

Exchange Commission ("SEC"), which failed to reflect the amount and purpose of payments made in violation of the FCPA.  Plaintiff seeks to recover damages against Individual Defendants for breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment.[3]

Pending before the Court are the following motions:

(1) Nominal Defendant Parker Drilling's motion to dismiss for failure to make demand upon the Board of Directors of Parker Drilling Company, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 23.1 (instrument #17), joined by Defendants Robert W. Goldman, George J. Donnelly, and Gary R. King's motion (#20);

(2) Defendants David C. Mannon, James W. Whalen, W. Kirk Brassfield, and Lynn G. Cullon's (collectively, "Moving Defendants'") motion to dismiss (#18) for failure to make demand upon the Board of Directors before filing the Amended Complaint;

(3) Defendants John W. Gibson, Jr., Robert E. McKee, III, Roger B. Plank, and R. Rudolph Reinfrank's (collectively,

---

[3] The Court notes that claims for abuse of control, gross mismanagement, and waste of corporate assets all arise from the alleged breach of fiduciary duties and have been viewed as merely repackaging the same issue under different causes of action rather than as separate torts.  *Clark v. Lacy*, 376 F.3d 682, 686–87 (7th Cir. 2004)(applying Delaware law); *In re Zoran Corp. Deriv. Litig.*, 511 F. Supp. 2d 986, 1019 (N.D. Cal. 2007).

the "Director Defendants'") motion to dismiss (#19) under
Rules 12(b)(6) and 23.1 and substantive Delaware law; and
(4) Robert L. Parker, Sr. and Robert L. Parker, Jr.'s
(also collectively, "Moving Defendants'") motion to
dismiss (#22) for failure to make demand upon Parker
Drilling Company's Board of Directors.

### Standard of Review

**Procedural Rules**

Federal Rule of Civil Procedure 8(a)(2) provides, "A pleading
that states a claim for relief must contain . . . a short and plain
statement of the claim showing that the pleader is entitled to
relief."  When a district court reviews a motion to dismiss
pursuant to Fed. R. Civ. P. 12(b)(6), it must construe the
complaint in favor of the plaintiff and take all well-pleaded facts
as true. *Randall D. Wolcott, MD, PA v. Sebelius*, 635 F.3d 757, 763
(5th Cir. 2011), *citing Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir.
2009).

"While a complaint attacked by a Rule 12(b)(6) motion to
dismiss does not need detailed factual allegations, . . . a
plaintiff's obligation to provide the 'grounds' of his
'entitle[ment] to relief' requires more than labels and
conclusions, and a formulaic recitation of the elements of a cause
of action will not do . . . ." *Bell Atlantic Corp. v. Twombly*, 127
S. Ct. 1955, 1964-65 (2007)(citations omitted).  "Factual

allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965, *citing* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, pp. 235-236 (3d ed. 2004)("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"). "*Twombly* jettisoned the minimum notice pleading requirement of *Conley v. Gibson*, 355 U.S. 41 . . . (1957)["a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"], and instead required that a complaint allege enough facts to state a claim that is plausible on its face." *St. Germain v. Howard*, 556 F.3d 261, 263 n.2 (5th Cir. 2009), *citing In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)("To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"), *citing Twombly*, 127 S. Ct. at 1974). *See also Alpert v. Riley*, No. H-04-CV-3774, 2008 WL 304742, *14 (S.D. Tex. Jan. 31, 2008). "'A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Montoya v. FedEx Ground Package System, Inc.*, 614 F.3d 145, 148 (5th Cir. 2010), *quoting Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009). Dismissal is appropriate when the plaintiff fails to allege "'enough facts to

state a claim to relief that is plausible on its face'" and therefore fails to "'raise a right to relief above the speculative level.'" *Montoya*, 614 F.3d at 148, *quoting Twombly*, 550 U.S. at 555, 570.

Federal Rule of Civil Procedure 23.1(b), addressing pleading requirements for derivative actions, imposes a higher pleading standard than Rule 12(b)(6) and requires that

> [t]he complaint must be verified and must
>
> (1) allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;
>
> (2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack, and
>
> **(3) state with particularity:**
>
> > **(A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and**
> >
> > **(B) the reasons for not obtaining the action or not making the effort.** [emphasis added by the Court]

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice. *Great Plains Trust Co v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)("District courts often afford plaintiffs at least one opportunity to cure pleading deficiencies

before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); *United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004)("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion. [citations omitted]").[4]

Federal Rule of Civil Procedure 15(a) provides in relevant part,

> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served.  Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

A court has discretion in deciding whether to grant leave to amend. *Foman v. Davis*, 371 U.S. 178, 181 (1962).  Since the language of the rule "'evinces a bias in favor of granting leave to amend," the court must find a "substantial reason" to deny such a request. *Ambulatory Infusion Therapy Specialists, Inc. v. Aetna Life Ins. Co.*, Civ. A. No. H-05-4389, 2006 WL 2521411, *3 (S.D. Tex. Aug. 29, 2006), *quoting Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir.

---

[4] Here Plaintiff filed his amended complaint before any responsive pleadings to his original complaint had been filed, so he did not have the benefit of input from Defendants or the Court.

2004), and *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 425 (5th Cir. 2004). Factors for the court to consider in determining whether a substantial reason to deny a motion for leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment." *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993).

**Substantive Law**

In a stockholder derivative suit, a stockholder pursues a cause of action that belongs to the corporation. *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1985), *overruled on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Parker Drilling is a Delaware corporation. Because Federal Rule of Civil Procedure 23.1 does not identify applicable substantive standards, the particularity of a plaintiff's pleadings is governed by the standards of the state of incorporation, here, Delaware. *Midwestern Teamsters Pension Trust Fund v. Baker Hughes, Inc.*, Civ. A. No. H-08-1809, 2009 WL 6799492, *4 ((S.D. Tex. May 7, 2009)*citing Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 92-99 (1991)), *adopted*, 2010 WL 3359560 (S.D. Tex. May 26, 2010).

In Delaware "[t]he decision whether to initiate or pursue a lawsuit on behalf of the corporation is generally within the power and responsibility of the board of directors. This follows from

-8-

the 'cardinal precept of the General Corporation law of the State of Delaware . . . that directors, rather than shareholders, manage the business and affairs of the corporation.'" *In re Citigroup Inc. Shareholder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009), *citing Aronson*, 473 A.2d at 811.  Under Delaware law, "[b]ecause directors are empowered to manage, or direct the management of, the business and affairs of the corporation, 8 Del. C. Sec. 141(a), the right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation." *Rales v. Blasband,* 634 A.2d 927, 932 (Del. 1993).  *See also Citigroup*, 964 A.2d at 120 ("to cause the corporation to pursue litigation, a shareholder must either (1) make a pre-suit demand by presenting the allegations to the corporation's directors, requesting that they bring suit, and showing that they wrongfully refused to do so, or (2) plead facts showing that demand upon the board would have been futile.  Where, as here, a plaintiff does not make a pre-suit demand of the board of directors, the complaint must plead with particularity facts showing that a demand would have been futile.").[5]  Federal Rule of Civil Procedure 23.1 is the procedural

---

[5] Usually derivative suits are used "to redress harm to a corporation allegedly resulting from misconduct by its directors." *Id.* at 933.  "Devised as a suit in equity, the purpose of the

embodiment of this substantive principle of corporation law. *Rales*, 634 A.2d at 932.

Under Delaware law, directors are entitled to the presumption that they were faithful to their fiduciary duties. *Beam ex rel. Martha Stewart Living Omnimedia v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004). In the context of a pre-suit demand, plaintiff bears the burden of rebutting that presumption in a shareholder derivative action by pleading particularized facts as to each director creating a reasonable doubt about the independence of the majority of the board of directors. *Id.* at 1048-49.

Where the plaintiff challenges a decision of the board, to determine whether a demand on the Board should be excused as futile, the court must apply a test established in *Aronson v. Lewis* [the "*Aronson* test"], 473 A.2d 805, 814 (Del 1984), *overruled on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 2000): "whether under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a

---

derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'" *Kamen v. Kemper Fin. Sys., Inc.*, 500 U.S. 90, 95 (1991), *quoting Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 548 (1949). "To prevent abuse of this remedy, however, equity courts established as a precondition 'for the suit' that the shareholder demonstrate 'that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary circumstances.'" *Id., quoting Ross v. Bernhard*, 396 U.S. 531, 534 (1970).

valid exercise of business judgment." *Rales*, 634 A.2d at 933, *citing Aronson,* 473 A.2d at 814. Demand is futile, and thus excused, only if the majority of the directors have so personal a stake in the matter at issue of the proposed litigation that they would be unable to make a proper business judgment if a demand is made. *Aronson*, 473 A.2d at 814. *See also Beam v. Stewart*, 845 A.2d 1040, 1046 (Del. 2004)("Demand is excused where a board is evenly divided between interested and disinterested directors."). "'Directorial interest exists whenever divided loyalties are present, or a director has received or is entitled to receive, a personal financial benefit from **the challenged transaction** which is not equally shared by the stockholders.'" *Rales*, 634 A.2d at 933*, quoting Pogostin v. Rice*, 480 A.2d 619, 624 (1984)(emphasis in original). *See also Aronson*, 473 A.2d at 812 (defining "disinterested" as "directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally."). "The question of independence flows from an analysis of the factual allegations pertaining to the influences upon the directors' performance of their duties generally, and more specifically in respect to **the challenged transaction**." *Id., quoting id.* "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than

extraneous considerations or influences." *Aronson*, 473 A.2d at 816. The second prong of the *Aronson* test, the business judgment inquiry, "focuses on the substantive nature of the challenged transaction and the board's approval thereof." *Rales*, 634 A.2d at 933, *citing Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984), *overruled on other grounds*, *Brehm*, 746 A.2d 244. If a derivative action challenges decisions made by the directors pursuant to their managerial authority, the plaintiffs "must overcome the powerful presumptions of the business judgment rule[6] before they will be permitted to pursue the derivative claim." *Rales,* 634 A.2d at 932. "These prongs [of the *Aronson* test] are in the disjunctive. Therefore, if either prong is satisfied, demand is excused." *Brehm*, 746 A.2d at 256.

Nevertheless, "[n]ot all derivative suits fall into [this] paradigm." *Rales*, 634 A.2d at 933. "Where there is no conscious decision by directors to act or refrain from acting, the business judgment rule has no application." *Id., citing Aronson*, 473 A.2d at 813. In such a circumstance the court must apply what is known "*Rales* test" and "determine whether or not the particularized

_____

[6] The business judgment rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company." *Aronson*, 473 A.2d at 812. "[W]here the business judgment [rule] presumptions are applicable, the board's decision will be upheld unless it cannot be attributed to any rational purpose." *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006).

factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.  If the derivative plaintiff satisfies this burden, then demand will be excused as futile." *Id.* at 934 (in essence eliminating the second prong of the *Aronson* test).  *See also Citigroup*, 964 A.2d at 120 (Where "plaintiffs complain of board inaction and do not challenge a specific decision of the board, there is no 'challenged transaction,' and the ordinary *Aronson* [two-prong] analysis does not apply.  Instead to show demand futility where the subject of the derivative suit is not a business decision of the board, the plaintiff must allege particularized facts that 'create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."), *citing Rales*, 634 A.2d at 934.

To adequately plead a derivative suit, a plaintiff must meet stringent requirements of factual particularity; conclusory statements and mere notice pleading are insufficient. *Brehm*, 746 A.2d at 254.  The "pleader must set forth . . . particularized factual statements that are essential to the claim.  Such facts are sometimes referred to as 'ultimate facts,' 'principal facts' or

'elemental facts.'" *Id.*   The plaintiff is not required to plead evidence.  *Id.*

Failure to make a demand is not excused merely because directors would have to sue themselves.  *Citigroup*, 964 A.2d at 121.  Instead, "demand will be excused based on a possibility of personal director liability only in the rare case when a plaintiff is able to show director conduct that is 'so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists,'" and not just a mere threat.  *Id., citing Aronson*, 473 A.2d at 815.  The shareholder plaintiff must plead futility of a demand for a majority of the director defendants, with individual allegations for each director.  *Id.* at 121 & n.36.

In *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996)(emphasis in original), the court distinguished two different contexts for a breach of duty to exercise appropriate attention or oversight: (1) "*a board decision* that results in a loss because the decision was ill advised or 'negligent'" and (2) an "*unconsidered failure of the board to act* in circumstances in which due attention would, arguably, have prevented the loss." "The first class of cases will typically be subject to review under the director-protective business judgment rule, assuming that the decision made was the product of a process that was *either* deliberately considered in good faith or was otherwise rational."

-14-

*Id.*  For the second type, oversight liability results "not from a decision but from unconsidered action." *Id.* at 968.  That is the type at issue in the instant action.  A "breach of [directors'] duty of attention or care in connection with the on-going operation of the corporation's business . . . is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Id.* at 967.  The *Caremark* court cited *Graham v. Allis-Chalmers Mfg. Co.*, 41 Del. Ch. 78, 188 A.2d 125 (1963), in which the Delaware Supreme Court examined the potential liability of board members for losses by the corporation resulting from the corporation's violations of antitrust laws where no one claimed that the directors knew about the behavior of subordinate employees that caused the problem. *Id.* at 969.  Instead the claim was that the directors ought to have known of it, and if they had known, they had a duty to bring the corporation into compliance with the law and avoided the loss. *Id.*  The Delaware Supreme Court held that "'absent cause for suspicion there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists.'" *Id.*  The absence of grounds for suspicion in that case led the justices to conclude that the directors were "blamelessly unaware of the conduct leading to corporate liability" and therefore there was no basis to find that they "breached a duty to be informed of the ongoing operations of the firm." *Id., citing*

-15-

*Graham*, 188 A.2d at 130.   The *Caremark* court concluded that today the *Graham* holding would be "narrowly interpreted" to be "absent grounds to suspect deception, neither corporate boards nor senior officers can be charged with wrongdoing simply for assuming the integrity of employees and the honesty of their dealings on the company's behalf." *Caremark*, 698 A. 2d at 969-70.   The *Caremark* Court would require that the board establish an information and reporting system "reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance," but it left the details of such a system to the good faith business judgment of the directors.   *Id.* at 970.[7]

───────────────

[7] In *In re Lear Corp. Shareholder Litig.*, 967 A.2d 640, 653-54 (Del. Ch. 2008), the court discussed the line of cases from *Graham* and *Caremark* to the present in addressing

> what is arguably the hardest question in corporation law: what is the standard of liability to apply to independent directors with no motive to injure the corporation when they are accused of indolence in monitoring the corporation's compliance with its legal responsibilities? The question is difficult for many reasons, including the reality that even the most diligent board cannot guarantee that an entire organization will always comply with the law.   But it must be answered because one of the central justifications for the use of independent directors is that they are well positioned to oversee management, particularly by monitoring the processes used by the corporation to accurately account for its financial affairs and comply with applicable laws.   When a fiduciary takes on a paying role, her duty of loyalty

In *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006), the Delaware Supreme Court approved of the *Caremark* standard for oversight liability, which is based on the concept of good faith and embedded in the fiduciary duty of loyalty:

> *Caremark* articulates the necessary conditions predicate for director oversight liability:  (a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operation thus disabling themselves from being informed of risks or problems requiring their attention.   In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations.   Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

---

> requires that she make a good faith effort to carry out those duties.  Although everyone has off days, fidelity to one's duty is inconsistent with persistent shirking and conscious inattention to duty.  For this reason, *Caremark* and its progeny have held that directors can be held culpable in the monitoring context if they breach their duty of loyalty by "a sustained or systematic failure .. . to exercise oversight, or were conscious of the fact that they were not doing their jobs [as monitors]."  More generally, our Supreme Court has held that to hold a disinterested director liable for a breach of the fiduciary duty of loyalty for acting in bad faith, a strong showing of misconduct must be made.  Thus in its [*In re the Walt Disney Co. Deriv. Litig.*, 906 A.2d 27 (Del. 2006)], the Supreme Court enumerated examples that all depended on purposeful wrongdoing, such as intentionally acting "with a purpose other than that of advancing the best interests of the corporation," acting "with the intent to violate applicable positive law," or "intentionally fail[ing] to act in the face of a known duty to act."  (footnotes omitted)

Thus to establish oversight liability a plaintiff must show with particularized facts that the directors *knew* they were not discharging their fiduciary obligations or that the directors demonstrated a *conscious* disregard for their responsibilities such as failing to act in the face of a known duty to act. *Caremark*, 698 A.2d at 971.   The test in rooted in concepts of bad faith; indeed a showing of bad faith is a *necessary condition* to director oversight liability. *Id.*   Under Delaware law, the mere fact that a violation occurred does not demonstrate that the board acted in bad faith. *Stone*, 911 A.2d at 373. *See also Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007)("Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so."); *In re IAC/InterActiveCorp.*, 478 F. Supp. 2d 574, 605 (S.D.N.Y. 2007)("Delaware courts recognize that no rationally designed system of information and reporting 'will remove the possibility that the corporation will violate laws or regulations.'")(*quoting Caremark*, 698 A.2d at 970).   Moreover, while to excuse demand, a derivative action plaintiff need only raise a reasonable doubt about the board's ability to impartially consider the demand, *Rales*, 634 A.2d at 934, where the plaintiff alleges the board cannot because it faces potential liability, the plaintiff needs to show "a substantial likelihood of personal

liability exists since the mere threat of liability is insufficient." *Aronson*, 743 A.2d at 814.

Delaware law imposes a stringent standard for corporate waste and mandates that the plaintiff plead "'facts showing that no person of ordinary sound business judgment could view the benefits received in the transaction as a fair exchange for the consideration paid by the corporation.'" *Lear Corp.*, 967 A.2d at 656, *quoting Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 892 (Del. Ch. 1999). Moreover if any reasonable person reviewing the facts alleged in the complaint might conclude that the transaction "'made sense, the judicial inquiry ends.'" *Id., quoting id.*

### Allegations of Plaintiff's Amended Complaint (#13)

Plaintiff Douglas Freuler ("Freuler"), at all relevant times a shareholder of Parker Drilling, a major provider of on-land and offshore drilling worldwide, including drilling rigs, project management, and rental tools to the energy industry with a strong focus on international drilling,[8] complains that Individual Defendants caused Parker Drilling to operate in Kazakhstan and Nigeria, where corruption and bribery were rampant. Defendants purportedly knew of the high probability that its employees,

---

[8] The Amended Complaint states that in 2009 Parker Drilling received approximately 50% of its revenue from foreign operations and that its annual revenues from international drilling were more than $200 million between 2007 and 2009. As of December 31, 2009 the Company placed eight of its fleet of forty-three drilling rigs in Kazakhstan.

representatives, agents, and/or contractors paid bribes to the
government officials to obtain or retain business for the Company,
but nevertheless authorized improper payments to these employees,
representatives agents and/or contractors to be able to do so.  The
complaint further charges that Individual Defendants failed to
establish and maintain internal controls to ensure compliance with
the FCPA, federal securities laws, and accounting regulations,
failed to enforce Parker Drilling's existing policies and programs
designed to prevent violations of federal laws and regulations, and
failed to adequately train Parker Drilling's employees, agents,
representatives and/or contractors to comply with the FCPA.

In addition, in violation of the reporting requirements under
the Securities Exchange Act of 1934, Individual Defendants caused
or permitted the Company to file false and misleading statements
with the U.S. Securities and Exchange Commission ("SEC") that did
not reflect the amount and purpose of the payments made in
violation of the FCPA.

Nevertheless some Individual Defendants signed certifications
pursuant to the Sarbanes Oxley Act of 2002 ("SOX"), misrepresenting
that the financial statements accurately reflected in all material
respects the financial condition of the Company.[9]

_____

[9] The Court notes that in *Guitierrez v. Cornell Companies*, No.
Civ. A. H-02-1812, 2005 WL 2121554, *9-10 (S.D. Tex. Aug. 31,
2005), Judge Sim Lake examined a claim in a shareholders derivative
action that five members of the audit committee faced a substantial
likelihood of liability for breaching their fiduciary duties

The complaint charges that Individual Defendants caused or
allowed Parker Drilling to pay bribes and kickbacks solely in order
to increase the company's multi-million dollar annual revenues
generated from Kazakhstan and Nigeria, which they judged to be
worth more than the risk of any fines for FCPA violations.

---

because they were "responsible for monitoring the quality and
integrity of the company's financial reporting process and systems
of internal controls regarding finance, accounting compliance," but
that they instead recommended to the board that improper financial
statements be included in the company's annual report filed with
the SEC on Form 10-K for two fiscal years.  The complaint alleged
that they breached their fiduciary "duties by causing or allowing
the improper financials . . . .  These filings were admittedly
erroneous, as the [c]ompany had to ultimately restate seven
quarters of financial statements . . . .  Further, these five
[d]efendants also signed the false and misleading [r]egistration
[s]tatement."
    Judge Lake held that "[t]hese conclusory allegations are
insufficient to raise an inference that a majority of Cornell's
directors face a substantial likelihood of liability for breach of
fiduciary duty."  2005 WL 2121554 at *9.  Quoting *Caremark*, he
opined that

> where a claim of directorial liability for corporate loss
> is predicated upon ignorance of liability creating
> activities within the corporation . . .  only sustained
> or systematic failure of the board to exercise
> oversight--such as utter failure to attempt to assure a
> reasonable information and reporting system exists--will
> establish the lack of good faith that is a necessary
> condition to liability.  Such a test of liability--lack
> of good faith as evidenced by sustained or systematic
> failure of a director to exercise reasonable oversight--
> is quite high.

*Id.* at 10*, citing Caremark*, 698 A.2d at 971.  Judge Lake pointed
out that plaintiff failed to allege any facts demonstrating that
the defendants knew that management had misrepresented the
company's financial condition or that the directors faced a
substantial likelihood of liability for breaching their fiduciary
duty of due care.  *Id.* at 10.

The Company's illegal bribery activities were investigated by federal authorities.  On March 3, 2010 the Individual Defendants caused Parker Drilling to state in its Annual Report that the U.S. Department of Justice ("DOJ") and the SEC ("SEC") had "identified issues relating to potential noncompliance with applicable laws and regulations, including the FCPA, with respect to operations in Kazakhstan and Nigeria."  The complaint charges that Individual Defendants wrongfully abdicated their fiduciary duties to Parker Drilling, failed to ensure compliance with Parker Drilling's Code of Conduct, the FCPA, and other laws, failed to establish, maintain, and enforce adequate oversight and internal controls over the Company's operations in Kazakhstan and Nigeria, failed to adequately train its employees, representatives, agents, and/or contractors about compliance with the FCPA, and breached their fiduciary duties to Parker Drilling by not directing Parker Drilling to sue the directors and officers for causing and/or allowing it to engage in violations of the FCPA.  The Individual Defendants have caused Parker Drilling to acknowledge that the situation in Kazakhstan could negatively impact some of its business operations in that country and have a material adverse impact on the entire company, including its operations, financial condition, and liquidity.  The Company's Code of Conduct stated, "Failure by any director, officer, employee or other representative to observe the letter and the spirit of our code of conduct may

-22-

result in serious damage to our business--including the possibility of legal prosecution, monetary losses and, of great importance, harm to [Parker Drilling's] strong reputation."

In addition to the damage to its goodwill and reputation, the complaint asserts that Parker Drilling has also incurred significant expenses, over $20 million, in investigating such illegal activities.

The complaint divides Parker Drilling's director and officer Defendants into two overlapping groups: (1) "Individual Defendants," comprised of Parker Drilling's directors and officers Robert L. Parker, Jr.,[10] Robert L. Parker, Sr.,[11] John W. Gibson,[12] Robert B. Plank,[13] R. Rudolph Reinfrank,[14] Robert E. McKee, III,[15]

---

[10] Parker, Jr. has been director of Parker Drilling since 1973 and the Board's Executive Chairman.  He was chief executive officer from 1991-2009.  The complaint states that he "is a control person of Parker Drilling because he has the power to direct or cause the direction of the Company's management and policy."

[11] Parker, Sr. has been a director since 1969 and Chairman Emeritus since 2006, and served as president from 1969-2006.  He, too, purportedly is a "control person" for the same reason.

[12] Gibson has been a director since 2001, is a member of the Audit Committee, and is also dubbed a "control person."

[13] Plank has been a director since May 2004, is Chairman of the Audit Committee, and a "control person."

[14] Reinfrank has been a director since 1993 and is a "control person."

[15] McKee has been a director since 2005 and is a "control person."

George J. Donnelly,[16] Robert W. Goldman,[17] Gary R. King,[18] David C. Mannon,[19] James W. Whalen,[20] W. Kirk Brassfield,[21] and Lynn G. Cullom[22]; and (2) "Audit Committee Defendants," composed of Defendants Plank, Donnelly, Gibson and King.  In addition, Parker Drilling is named as Nominal Defendant.  The true names of the John Does are not yet known to Plaintiff, who will seek to amend to add the true names and capacities when they are ascertained.

Individual Defendants owe fiduciary duties of candor, good faith, and loyalty to the Company and to its shareholders.  Because of their positions of control and authority, they allegedly exercised control over the wrongful acts described in the complaint.  Because of their executive and directorial positions,

---

[16] Donnelly has been a director since October 2005, is a member of the Audit Committee, and is a "control person."

[17] Goldman has been a director since October 2005.

[18] King has been a director since September 2008, is a member of the Audit Committee, and is a "control person."

[19] Mannon has been President, Chief Executive Officer, and a director since October 2009.  From July 2007 to October 2009 he was President and Chief Operating Officer, and from December 2004 to July 2007 he served as Senior Vice President and Chief Operating Officer.  He, too, is a "control person."

[20] Whalen was the Board's Vice Chairman from 2005-2009 and is a "control person" of the Company.

[21] Brassfield has been Chief Financial Officer since October 2005 and is a "control person."

[22] Cullon was Corporate Controller between March 2005 and September 2009 and is a "control person."

-24-

each Individual Defendant knew or should have know that doing business in countries like Kazakhstan and Nigeria involved a high risk of corruption and that Parker Driller was doing business there without establishing and maintaining a FCPA compliance program designed to detect, deter, and ultimately prevent improper payments to foreign officials and other third parties.  The complaint quotes a statement from President and Chief Executive Officer to the Company's directors, officers and other representatives urging integrity (doing "the right thing--in all of our actions"), which "is the foundation supporting the four pillars of our business: safety, training, technology and performance," and meeting the "highest ethical and business standards," which requires more than compliance with the law.  The complaint charges Individual Defendants with breaching their duties of loyalty and good faith in failing to maintain adequate internal controls in compliance with FCPA or its underlying directives regarding books, records, and accounting, designed to uncover the type of improper payments made by Parker Drilling.

Individual Defendants because of their positions exercised control over Parker Drilling with regard to the illegal acts, the public statements issued by the Company, and the financial statements it filed with the SEC.  They also had access to non-public information about the company's financial condition and operations and its use of customs agencies in Kazakhstan and

Nigeria.  They failed to establish internal controls and accounting systems adequate to detect or deter improper payments violating the FCPA, which violations they knew about from those controls the Company did have in place.

The Audit Committee Charter indicates that Defendants Plank, Donnelly, Gibson and King are responsible for assisting the Board in overseeing the performance of the Company's internal audit function and the Company's compliance with legal and regulatory requirements, including reviewing the appointment and replacement of the director of internal auditing, reviewing significant reports prepared by the internal auditing department and management responses, and discussing with the independent accountant and management the internal audit department responsibilities, budget and staffing, and any recommended changes in the planned scope of the internal audits.  Regarding oversight of compliance, Audit Committee Defendants are required to obtain from the independent accountant assurance that Section 10A(b) of the Exchange Act has not been triggered based on information discovered during the audit; to obtain an annual report from management that the Company and its subsidiary/foreign affiliated entities are in conformity with applicable legal requirements and the Company's Code of Corporate Conduct based on annual compliance statements received from employees and agents; to review reports and disclosures of insider and affiliated and related-party transactions; to advise

the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and the Company's Code of Corporate Conduct; to establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential anonymous submission by employees of concerns regarding questionable accounting or auditing matters; to discuss with management and the independent accountant any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies; and to discuss with the Company's counsel legal matters that may have a material impact on the financial statements or the Company's compliance policies and internal controls.  The complaint asserts that the Audit Committee Defendants failed to carry out their obligations with respect to internal audit and compliance oversight and created an environment at Parker Drilling that permitted violations of the FCPA to occur without detection.

As noted, the FCPA bars U.S. issuers or anyone acting on their behalf from giving bribes or kickbacks to any foreign official to obtain or retain business.  It imposes accounting control requirements that the issuer (a) make and keep books, records and accounts, which in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; and (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP") or any other criteria applicable to such statements, and to maintain accountability for assets.  Under state fiduciary law, the Board, with the assistance of the Audit Committee, is ultimately responsible for establishing and maintaining these FCPA-compliant programs.  The complaint claims that Defendants failed to ensure that Parker Drilling complied with the FCPA's requirements.

On May 12, 2008 Individual Defendants caused Parker Drilling to file its Quarterly Report on Form 10-Q for the period ending March 31, 2008 with the SEC.  In that 10-Q Parker Drilling summarily stated that the DOJ and the SEC had opened investigations on possible violations of the FCPA by Parker Drilling, including in Kazakhstan and Nigeria.  Parker Drilling provided no additional information in the next 20 months, but continued to make similar boilerplate disclosures about the investigations, so that its shareholders were unable to obtain more information about the nature and scope of these investigations.  On March 3, 2010, the Individual Defendants caused Parker Drilling to file its annual Form 10-K with the SEC, in which it disclosed that the

investigations by the DOJ and the SEC had "identified issues relating to potential noncompliance with applicable laws and regulations, including the FCPA, with respect to [Parker Drilling's] operations in Kazakhstan and Nigeria." Individual Defendants also disclosed that potentially illegal payments had been made to a government official in Kazakhstan via a joint venture arrangement between Parker Drilling and a foreign subcontractor. They also revealed that the possible violations could have a material adverse impact on all of Parker Drilling's business.

On May 7, 2010, Individual Defendant caused Parker Drilling to repeat those statements and to warn of serious adverse consequences, including injunctions, disgorgement, fines, penalties, modifications to business practices and compliance programs, deferred prosecution agreements, guilty pleas, retention of a monitor to oversee Parker Drilling's compliance with the FCPA, ending or modifying existing business relationships, and other sanctions, as a result of the discovery of the illegal activities.

An April 2009 news report stated that Kazakhstan's State Agency for the Control of Economic and Corruption Crimes was investigating Parker Drilling for possible criminal tax evasion. The complaint claims that these reports show that Individual Defendants failed to establish and maintain adequate internal controls to ensure compliance with the FCPA, federal securities

laws and accounting regulations; to enforce the Company's policies and programs that were designed to prevent violations of existing federal laws, regulations, policies and programs; and to adequately train the Company's employees representatives, agents, and/or contractors to comply with the FCPA, or establish a monitoring program for its foreign agents and distributors to comply with the FCPA. Individual Defendants purportedly "made no effort to enforce the company's own anti-bribery policies and turned a willful and blind eye to the kickbacks and bribes funded and paid by Parker Drilling." These failures caused Parker Drilling to hire Panalpina World Transport (Holding) Ltd. and its subsidiaries (collectively, "Panalpina"). Panalpina recently settled charges of FCPA violations in several countries, including Kazakhstan and Nigeria, by paying more than $11 million in disgorgement and $70 million in criminal fines.

The complaint also asserts that Parker Drilling's employees, representatives, agents, and/or contractors, authorized by Individual Defendants as well as by Parker Drilling's accountants and auditors, paid or offered to pay bribes to foreign officials in Kazakhstan and Nigeria in order to enrich themselves and advance Parker Drilling's business interests. The complaint contends that the bribes were not accurately described in the Company's books and records.

In the Company's March 3, 2010 Form 10-K, signed by Parker, Jr., Mannon, Brassfield, Donnelly, Gibson, Goldman, King, McKee, Plank, and Reinfrank, the Individual Defendants caused the Company to identify "solicitation by government officials for improper payments or other forms of corruption" as one risk of its international operations. The complaint complains of Parker Drilling's ongoing operational issues with Kazakh customs. Freuler identifies as an example, in July 2004, when then Chief Executive Officer Robert L. Parker, Jr. became involved in trying to obtain the release of Parker Drilling's Rig 257 "Sunkar" drilling platform, seized by the Kazakh customs.[23]  It conclusorily repeats Individual Defendants allegedly knew or should have known that doing business in countries like Kazakhstan and Nigeria involves a high risk of corruption, but nevertheless they did not establish and maintain a FCPA compliance program designed to detect, deter, and prevent improper payments to foreign officials and other third parties or directives regarding books, records and accounting designed to ferret out and prevent the type of improper payments made by Parker Drilling.

---

[23] The complaint states that the rig was seized because Parker Drilling refused to pay $4.26 in customs duties and a $1.7 million fine.  Parker Drilling on July 2, 2004 stated that it was "cooperating with the governmental authorities to the fullest extent, and believe[d] judicial review of the documentation we have provided will result in the resolution of this dispute in our favor," indicating that the dispute was known to the Board and the highest level of the Company's management and was discussed by Individual Defendants.

Arguing that making a demand upon the Board would be futile, Plaintiff points out that Individual Defendants have refused to take action against those, including themselves, who are responsible for Parker Drilling's business in Kazakhstan and Nigeria and for failing to establish, maintain, and enforce adequate internal controls for compliance with the FCPA. They have not sued themselves or their fellow directors and allies in the top ranks of the Company for the violations of law, people with whom they have professional relationships, who are friends, and with whom they have entangling financial alliances and interests and dependencies.[24]   Indeed to properly prosecute this action the

---

[24] This Court observes that Delaware courts have made clear that a plaintiff showing that demand would be futile must do more that conclusorily assert entangling alliances. *Beam ex rel. Stewart v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004)("A variety of motivations, including friendship, may influence the demand futility inquiry. But to render a director unable to consider demand, a relationship must be of a bias-producing nature. Allegations of mere personal friendship or mere outside business relations, standing alone, are insufficient to raise a reasonable doubt about a director's independence."). "Not all friendships, or even most of them, rise to the level" of raising a reasonable doubt whether a director can independently consider a demand, and a court "cannot make a *reasonable* inference that a particular friendship does so without specific factual allegations to support such a conclusion." *Id.* (emphasis in original). In *Beam*, the court examined at length what it dubbed the "structural bias" argument, which "presupposes that the professional and social relationships that naturally develop among members of a board impede independent decisionmaking." *Id.* at 1050-52 (and cases cited therein). The court rejected the plaintiff's efforts to plead affinity beyond mere friendship between Martha Stewart and the other directors of her company as factually insufficient to demonstrate demand futility. Without factual specificity, "[m]ere allegations that they move in the same business and social circles, or a characterization that they are close friends, is not enough to

Individual Defendants would have to sue a majority of themselves.

The complaint maintains that illegal payments made on behalf of Parker Drilling did not appear on the Company's books and records, in violation of the FCPA, thereby demonstrating Individual Defendants' decision to deprive the Company of FCPA-compliant internal controls.  The government investigations show that the improper payments occurred over years.  The lack of internal controls is highlighted by the fact that Parker Drilling operated in countries with rampant corruption.  The decision not to implement such controls is not entitled to business judgment protection, and thus demand on the Board would be futile and is excused.

Moreover members of the Board have benefitted and continue to benefit from the alleged wrongdoing and have engaged in such conduct to preserve their positions of control and accompanying perquisites.  Thus they are incapable of exercising independent, objective judgment in deciding whether to bring this action.  They also receive substantial remuneration from the Company, which is

---

negate independence for demand excusal purposes." *Id.* at 1051-52. "To create a reasonable doubt about an outside director's independence, a plaintiff must plead facts that would support the inference that because of the nature of a relationship, or additional circumstances other than the interested director's stock ownership or voting power, the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director." *Id.* at 1052.

increased by the wrongdoing resulting in economic benefits to
Parker Drilling.[25]

Individual Defendants also face substantial liability under
the Securities Exchange Act because the improper payments were not
properly reflected on the Company's Forms 10-Q and 10-K financial
statements, filed with the SEC.  Individual Defendants, as control
persons under Section 20(a), 15 U.S.C. § 20(a), caused or allowed
these materially misleading forms to be filed by failing to
disclose the proper characterization, amount, and purpose of the
illegal payments.[26]  Individual Defendants also violated Section

---

[25] This Court notes that in *Midwestern Teamsters Pension Trust
fund v. Baker Hughes Inc.*, Civ. A. No. H-08-1809, 2009 WL 6799492,
*8 (S.D. Tex. May 7, 2009), *adopted*, 2010 WL 3359560 (S.D. Tex. May
26, 2010), the magistrate judge found identical allegations to
those in this paragraph to be factually deficient for the purpose
of excusing lack of demand:

> Plaintiffs allege no facts to support those contentions,
> *See* Rule 23.1.  Plaintiffs do not, for instance, describe
> how each individual Board member benefited from the FCPA
> violations, or even identify the particular benefits at
> issue.  Nor do Plaintiffs allege specific Board decisions
> that were designed to "preserve their positions of
> control," "conceal . . . wrongs." or "waste . . .
> valuable assets."  Because Plaintiffs have failed to
> state particularized facts to support their allegations,
> they have not shown that demand is futile.

[26] Nevertheless the Delaware Supreme Court has opined that
"execution of . . . financial reports, without more, is
insufficient to create an inference that the directors had actual
or constructive notice of any illegality." *Wood v. Baum*, 953 A.2d
136, 142 (Del. 2008). *See also Citigroup*, 964 A.2d at 134 & n.92
(quoting above statement from *Wood v. Baum*)("Plaintiffs do not
allege facts suggesting that the director defendants prepared the
financial statements or that they were directly responsible for the
misstatements or omissions.  The Complaint merely alleges that

13(a) of the Exchange Act and rules 12b-20, 13a-1, and 13a-13 requiring covered companies to file annual and periodic reports disclosing specific information necessary to make the required statements, in light of the circumstances under which they are made, not misleading and face potential liability, again making a demand upon the Board futile.  So did their failure to devise and maintain a system of internal accounting control to provide reasonable assurances that transactions in Kazakhstan and Nigeria were accurately and properly reported, in conformity with such standards as GAAP.

The complaint also asserts that Individual Defendants (including Brassfield, Mannon, and Parker, Jr.) are also potentially liable for signing the SOX certifications, making them responsible for establishing and maintaining disclosure controls and internal controls over financial reporting, for each of the Forms 10-Q and 10-K from December 31, 2005 through September 10, 2009, making demand futile.  Because the certifications were known to the Audit Defendants and the Individual Defendants had access to review them, each of the Individual Defendants knew about the deficiencies in the financial reporting of the payments made in

---

Citigroup's financial statements contained false statements and material omissions and that the director defendants reviewed the financial statements pursuant to their responsibilities under the ARM Committee charter.  Thus I am unable to reasonably conclude that the director defendants face a substantial likelihood of liability.").

violation of FCPA. The certifications demonstrate that the Individual Defendants directly or indirectly participated in managing, implementing and supervising Parker Drilling's compliance program and were systematically and although repeatedly informed about violations of applicable laws, in violation of their fiduciary duties ignored the information presented to or available to them as directors and/or officers of the Company.

Finally the complaint alleges that the Individual Defendants are not disinterested based on the "insured versus insured" exclusion in the directors' and officers' liability insurance, which they caused Parker Drilling to purchase for their protection with corporate funds, i.e., monies belong to its stockholders. Due to changes in the policy's language in the last few years, according to the complaint, in an "insured versus insured exclusion" the policy now eliminates coverage for any action brought directly by Parker Drilling against these Defendants (the "insured versus insured exclusion for actions by the Board against its members). If a suit is brought derivatively, however, coverage would exist and provide a basis for Parker Drilling to effectuate a recovery.

The complaint alleges five counts, each against all Individual Defendants: (1) Count One for intentional breach or reckless disregard of their fiduciary duties; (2) Count Two for abuse of their abilities to control and influence Parker Drilling; (3) Count

Three for Gross Mismanagement of Parker Drilling's business and affairs; (4) Count Four for waste of corporate assets; and (5) Count Five for unjust enrichment as a result of the compensation and director remuneration they received while breaching their fiduciary duties to Parker Drilling.

**Defendants' Motions to Dismiss for Failure to Make Demand Upon the Board and Failure to Show Demand Would Be Futile**

Defendants, who join the motions and incorporate the motions of each other, make the same basic arguments, although they cite different authority.  They contend that because Plaintiff did not make a demand on the Board before filing this derivative action, the focal issue here is whether he has shown exceptional circumstances that excuse him from having to do so.  They argue that he fails to make the requisite particularized pleading with respect to each of the thirteen Individual Defendants to show futility.  *Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007)("Delaware law does not permit the wholesale imputation of one director's knowledge to every other for demand excusal purposes. Rather, a derivative complaint must plead facts <u>specific to each director</u>, demonstrating that at least half of them could not have exercised disinterested business judgment in responding to the demand."); *Khanna v. McMinn*, No. 20545-NC, 2006 WL 1388744, *14 (Del. Ch. May 9, 2006)(demand futility analysis "is fact-intensive and proceeds director-by-director and transaction-by-transaction");

*In re Emerging Communications, Inc. Shareholders Litig.*, No. Civ.
A. 16415, 2004 WL 1305745, *38 (Del Ch. May 3, 2004)("The liability
of the directors must be determined on an individual basis because
the nature of their breach of duty (if any), and whether they are
exculpated from liability for that breach, can vary for each
director."). Furthermore the analysis must be for each claim
asserted. *See, e.g., Beam ex rel. Martha Stewart Living Omnimedia,
Inc. v. Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003)("Demand
futility analysis is conducted on a claim-by-claim basis"), *aff'd*,
845 A.2d 1040 (Del. 2004).

Because the most comprehensive of the motions to dismiss is
Nominal Defendant Parker Drilling's, the Court addresses it rather
than summarize each Defendant's separately. Nominal Defendant
argues that the "Amended Complaint is a mishmash of claims pleaded
against every defendant, even when it is unclear the claim can be
made against all of them." #17 at 10. Moreover the Board's
composition changed over the years but Plaintiff fails to allege
that the majority of directors were members when the alleged
violations occurred. Even the claims against the Audit Committee
are not particularized to any director or claim.

Nominal Defendant maintains that Plaintiff fails to plead
particularized facts creating a reasonable doubt that a majority of
the current directors are disinterested and independent for his
claim excusing demand based on the directors' oversight duties.

*Rales*, 634 A.2d at 934.  As noted by this Court, Delaware law requires a plaintiff pleading director oversight liability to provide facts creating a "substantial likelihood of liability" and make a showing that the directors had actual knowledge that they were not discharging their fiduciary duties.  *Stone*, 911 A.2d at 370 (for director oversight liability plaintiff must show that (1) directors failed to implement any reporting or information system or controls, or if they did, they consciously failed to monitor or oversee its operations; plaintiff must show that the directors knew they were not discharging their fiduciary obligations).  Here Plaintiff assumes that because a FCPA investigation of potential non-compliance is ongoing, Parker Drilling must be culpable, but no conclusions of wrongdoing have been reached.  Even where wrongdoing can be shown, it must still be known to and ignored by the directors before an oversight claim is actionable.  *Midwestern Teamsters Pension Trust Fund, Inc. v. Baker Hughes, Inc.*, Civ. A. No. H-08-1809, 2009 WL 679492, *6, 8 (S.D. Tex. May 7, 2009), *adopted*, 2010 WL 3359560 (S.D. Tex. May 26, 2010); *Desimone*, 924 A.2d at 940.  Instead Plaintiff's pleadings in essence are based on a legally improper inference--problems occurred, therefore they were known, and they were not addressed.  *Baker Hughes*, 2009 WL 679492, *6 ("Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known

so."), *quoting Desimone*, 934 A.2d at 940.  Furthermore, "[n]o rationally designed system of . . . reporting will remove the possibility that the corporation will violate laws or regulations." *Id.*

Nominal Defendant discusses two Delaware cases with more specificity in pleading than that in the instant action, but which were still dismissed by Delaware courts for insufficient particularized pleading in order to show that courts, applying Delaware law, view oversight liability very narrowly.

In *Guttman v. Huang*, 823 A.2d 492, 493 (Del. 2003), a shareholders derivative suit against all directors alleging they were liable for insider trading for personal advantage (identifying how much stock each sold on what date for what amount) while in possession of material, non-public information and/or failure to prevent accounting irregularities that led to a restatement of its financial statements for the period when the stock sales occurred, the plaintiff alleged that the directors faced a substantial likelihood of liability.  Of the seven-member board, the court found at most that allegations against only two provided facts that might show compromised independence and a substantial likelihood of liability.  "[T]he mere fact that two of the directors sold large portions of their stock does not . . . support the conclusion that those two directors face a real threat of liability."  823 A.2d at 504.  The court found to be only conclusory the allegations that

the other five directors had reason to know that the company's
financial statements were misstated, with no facts detailing the
precise roles that they played at the company, what information
would have come to their attention in those roles, and any
indication as to why they would have perceived the accounting
irregularities.  Though the directors received substantial proceeds
from their stock sales, there were no particularized facts
supporting an inference of insider trading; the timing of the
trades was disparate, with the only common pattern being that they
followed the filing of a certified financial statements and that
pattern was consistent with the possibility that the company
allowed stock sales at such times because it lessened the chance
that insiders could exploit outside market buyers.  While the
complaint asserted that the trades were inconsistent with these
same defendants' trading practices the prior year, it did not
identify what trades, if any, these defendants had made the prior
year.  Nor did it reveal whether these defendants traded because
their options were expiring or because IPO-related restrictions on
liquidity recently ended.   The judge further opined that
plaintiffs should have obtained access to the company's books and
records under 8 Del. C. § 220 before they filed suit so that they
could plead the requisite particularized facts to meet the legally
required pleading standard.   As for the pleading standard for
liability for failures of oversight under *Caremark*, the court found

plaintiffs did not come close; they should have detailed how often and for how long the audit committee met, whether it was comprised of independent directors and how they could tell, how they got notice of the alleged accounting irregularities, and what constituted red flags and showed the majority of the board faced a sufficient threat of liability to compromise their ability to act impartially on a demand under *Rales*.   The court concluded that demand was not excused because, given the failure to plead particularized facts, it "was impossible to tell anything about the financial compliance system in place" and it could only speculate about the adequacy of the company's oversight program.

In the second case, *Baker Hughes*, 2009 WL 6799492,, *adopted*, 2010 WL 3359560 (S.D. Tex. May 26, 2010), the shareholders complain of a failure of oversight by directors that led to a $44 million fine and a guilty plea by a subsidiary of the company.   They pointed out that previously Baker Hughes had admitted to FCPA problems.   The United States Magistrate Judge refused to find these allegations sufficient to show that the board knew of, but failed to address, FCPA compliance concerns; she recommended dismissal of the complaint, explaining that "Plaintiff's conclusory allegations leave one free to imagine that either Baker Hughes had the most comprehensive compliance program in the industry, or the most deficient."   *Id.* at *8.   The district court adopted her

recommendation and dismissed the complaint.  2010 WL 3359560 (S.D. Tex. May 26, 2010).

Nominal Defendant insists that in the case *sub judice*, Plaintiff lacks even the bare facts alleged in *Guttman* and *Baker Hughes*.  For example, it fails to identify the reports allegedly prepared by the internal auditing department and independent accountants and reviewed by the Audit Committee, how each Individual Defendant knew the Company was violating internal controls it had in place for compliance with the FCPA and how and why they were inadequate, what controls were violated, when, how and by whom, how the Directors gained this knowledge, what they should have done to the controls to make them more effective, etc.

Plaintiff further pleads that demand should be excused because of the Board's potential liability for various vague and unclear affirmative actions such as allowing the Company to operate and use custom agents in Kazakhstan and Nigeria without first establishing adequate and effective controls and account systems.  If Plaintiff is challenging an improper act of the Board, he must satisfy the *Aronson* test, but has not.  Regarding the first prong, requiring specific facts to create a reasonable doubt that directors could impartially evaluate a demand, "directors are entitled to a presumption that they were faithful to their fiduciary duties,  In the context of presuit demand, the burden is upon the plaintiff in a derivative suit to overcome that presumption.  *Beam ex rel.*

-43-

*Martha Stewart Living Omnimedia*, 845 A.2d at 1048-49; *see also Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991)("When the challenged transaction is approved by [the] board, the majority of whom are outside, non-management directors, 'a heavy burden falls on [plaintiffs] to avoid presuit demand.'"), *quoting Grobow v. Perot*, 539 A.2d 180. 190 (Del. 1988), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  Plaintiff has not overcome such a presumption.

The complaint states very little about the Board's purported improper actions.  Asserting corporate waste, it says nothing about what a majority of directors did that constituted waste, what they actually knew about the action, or how they damaged the company. The claim for unjust enrichment is similarly conclusory, with only a vague reference to compensation and director remuneration.  There is no specific allegation as to what they each did that abused their control, what misrepresentations they each made to shareholders nor why the misrepresentations were material nor how they misled shareholders nor what they should have disclosed nor how they knew the statements were misleading.[27]   To allege an

---

[27] The Court observes that to state a claim for unjust enrichment under Delaware law, a plaintiff must allege (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.  *In re Accuray, Inc. Shareholder Deriv. Litig.*,757 F. Supp. 2d 919, 935 (N.D. Cal. 2010), *citing Jackson v. Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999).  In an allegation virtually identical to that asserted by Plaintiff here, the plaintiffs in

-44-

improper action by the Board Plaintiff must also overcome the presumption of the business judgment rule with particularized facts showing that the Board could not make a decision fairly and independently in the best interests of the Company, but does not do so here.  While Plaintiff also claims that the directors benefitted from their wrongdoing, he also fails to describe these benefits or perquisites or plead that they are material to the directors.  As for his argument that demand should be excused because directors have not filed a similar lawsuit, it is not only unsupported by facts, but it has been soundly rejected by courts.  *See, e.g., Richardson v. Graves*, No. C.A. 6617, 1983 WL 21109, *3 (Del Ch. June 17, 1983).

Last of all the insured v. insured clause exclusion argument has been regularly rejected by courts.  *See, e.g., Carauna v. Saligman*, Civ. A. No. 11135, 1990 WL 212304, *4 (Del. Ch. Dec. 21, 1990); *Stoner v. Walsh*, 772 F. Supp. 790, 805 (S.D.N.Y. 1991).  Defendants Gibson, Mckee, Plank and Reinfrank cite *In re AIG, Inc. Deriv. Litig.*, 700 F. Supp. 2d 419, 433 (S.D.N.Y. 2010)("[Demand futility based on the existence of an 'insured vs. insured' exclusion in the Company's directors' and officers' liability

---

*Accuray* conclusorily asserted that the defendants "were unjustly enriched as a result of the compensation and director remuneration they received while breaching the fiduciary duties owed to Accuray." *Id.*  The court opined that the plaintiffs "failed to allege how each Defendant was unjustly enriched at the expense of Accuray" and dismissed the unjust enrichment claim. *Id.*

policies is an 'argument [that] has been rejected repeatedly under Delaware law."), *citing Ferre v. McGrath*, No. 06 Civ. 1684, 2007 WL 1180650, *8 (S.D.N.Y. 2007); *Kernaghan v. Franklin*, No. 06 Civ. 1533, 2008 WL 4450268, *7 (S.D.N.Y. 2008); and *Halpert Enterprises, Inc. v. Harrison*, 362 F. Supp. 2d 426, 433 (S.D.N.Y. 2005)..

Nominal Defendant closes its brief by stating that Plaintiff, if he believes his suit has merit, should present his claim to the Board for action.  Because he has not done so, his complaint should be dismissed with prejudice.

## Court's Decision

Noting that the enhanced pleading requirements for excuse from making a demand on the board of directors in a shareholder derivative action under Federal Rule of Civil Procedure 23.1 and Delaware law have long been established, as is apparent from this Court's summary of the applicable law and the allegations in Plaintiff's amended complaint, the Court fully agrees with Defendants that Plaintiff has clearly not satisfied them here. Moreover he has asserted claims against Individual Defendants collectively and fails to distinguish their individual roles with respect to all claims.

Accordingly the Court

ORDERS that Defendants' motions to dismiss (#17, 18, 19, 20, and 22) the amended complaint are GRANTED WITHOUT PREJUDICE. Because the Court finds no "undue delay, bad faith or dilatory

motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment" under Federal Rule of Civil Procedure 15(a) here, Plaintiff is GRANTED LEAVE to file an amended complaint within twenty days of entry of this order if he can meet the pleading requirements set out in this opinion or he shall inform the Court that he does not wish to pursue this suit. If an amended pleading is filed, Defendants shall file a timely response.

**SIGNED** at Houston, Texas, this  30th  day of  June , 2011.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE